# Exhibit 1

# AGREEMENT FOR SERVICES

THIS AGREEMENT FOR SERVICES (this "Agreement") is made as of July 27, 2023 (the "Effective Date"), by and between PPC Squared Digital Marketing Inc. with a principal place of business at 142 5th Avenue, North #B, Franklin, TN 37064 ("Service Provider"), and Keller Postman, LLC, with a principal place of business at 150 N. Riverside Plaza, Suite 4100, Chicago, IL 60606 ("Principal").  In consideration of the premises set forth below and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and subject to the terms and conditions of this Agreement, the parties agree as follows:

1. Services.

    1.1. Service Provider shall provide services (the "Services") to Principal related to marketing and intake for Principal of presumptively qualified claimants (as reasonably determined by Principal) who wish to retain the services of Principal. The Services may include the development and creation of visual media presentations, productions, and other marketing materials to be used on behalf of Principal in the promotion of Principal's services (the "Productions"), all as further detailed in invoices or scopes of work attached as exhibits hereto from time to time (each, an "SOW").

    1.2. Service Provider will, in connection with the foregoing, comply with all of Principal's instructions that may be delivered in connection with the Services (including, by way of illustration, any instructions (i) that Service Provider adhere to certain standards and practices when managing underlying marketing campaigns and intake processes for benefit of the Principal, and (ii) where requested by Principal, that Service Provider use Principal's preferred form of intake questionnaire and other intake related documentation when communicating with presumptively qualified claimants).

    1.3. For the purposes of this Agreement, "Affiliate" is defined as is any legal entity that is owned by a party or that owns a party or that is under common control with a party.

2. Term.  The term of this Agreement shall begin on the Effective Date and shall continue until terminated as provided herein (the "Term").

3. Independent Contractor Relationship. Service Provider's relationship with Principal shall be that of an independent contractor, and, accordingly, Service Provider will be solely responsible for the payment of all wages, federal, state, and local income taxes, government-mandated deductions and payments for social security, unemployment, and worker's compensation related to its business. Service Provider shall have no authority to contract for or bind Principal in any manner and shall not represent itself to be an agent of Principal. Nothing in this Agreement shall be construed as creating a partnership, joint venture, pooling arrangement, employer-employee relationship, or formal business organization of any kind, and the rights and obligations of the parties shall be only those expressly set forth herein.

4. Compensation. As Service Provider's sole remuneration for the Services provided hereunder, Principal will pay Service Provider its documented, out-of-pocket cost of marketing, intake, and related services, plus a commission on those services as identified in the SOW (the "Service Provider's Fee").  Principal will, if and to the extent contemplated by the SOW, also reimburse Service Provider for other out-of-pocket expenses incurred by Service Provider that are identified and pre-approved in writing by Principal.

5. Principal Data, IP, and Deliverables.

5.1. As between Principal and Service Provider, Principal will own all right, title and interest in and to any data and information disclosed by or on behalf of Principal, on the one hand, or that may otherwise be collected or obtained by or on behalf of Service Provider in connection with the Services, on the other hand (including all data and information associated with all potential client leads developed for, and all clients actually retained by, Principal) (collectively, "Principal Data"). Principal Data shall include, by way of example, any information that: (i) identifies, relates to, describes, is capable of being associated with, or could be reasonably linked, directly or indirectly, with a particular consumer or household; or (ii) can be used in conjunction with other personal or identifying information to identify or locate a specific individual; or (iii) is defined as "Personal Information", "PII, "Personally Identifiable Information", or "Personal Data" or other similar terminology by Applicable Laws (as defined below) (collectively "Personal Data"). With respect to Personal Data, Service Provider and Principal agree that Service Provider is a service provider to Principal as defined by Applicable Laws.  Service Provider acknowledges and affirms that it does not receive any Personal Data as consideration for any Services or other items provided under the Agreement. Principal Data shall be considered Principal's Confidential Information (as defined below) and may not be retained or used by Service Provider for any purpose other than for the Services (which, for the avoidance of doubt, also prohibits Service Provider from retaining, using, or disclosing Personal Data outside of its direct business relationship with Principal or for any other commercial purpose) or disclosed by Service Provider to any third party without the prior written consent of Principal. Without limiting the foregoing, at all times during or after the Term, Service Provider will not license, transfer, distribute or otherwise commercially exploit or make any Principal Data available to any third party. Service Provider shall contractually obligate any third parties performing Services on its behalf under this Agreement to likewise limit data uses as outlined in this section and shall be liable for such third parties' compliance therewith. Upon request by Principal, Service Provider will promptly provide Principal with an electronic copy of all Principal Data available to Service Provider. Service Provider will provide any such Principal Data so requested by Principal in such format, manner and medium, and in accordance with such specifications, as may reasonably be determined by Principal.

5.2. Principal exclusively owns and retains its ownership of all materials provided by Principal to Service Provider hereunder as well as Principal's trademarks, copyrights, logos and all other intellectual property (collectively "Principal IP"). Service Provider's use of Principal IP, if any, inures to the benefit of Principal, including any goodwill therein, and Service Provider will not acquire any ownership in Principal IP as a result of this Agreement or in the course of providing the Services.

5.3. All Productions and other copyrightable material conceived, created, delivered or reduced to practice, in whole or in part, by Service Provider in the course of providing the Services (collectively, "Deliverables") shall be owned by Service Provider as the sole and exclusive property of Service Provider (other than, for clarity, to the extent of any Principal Confidential Information, Principal Data or Principal IP reflected therein). To the extent that Service Provider has hired employees or engaged subcontractors or affiliates to provide the Services, Service Provider will cause all necessary releases and agreements to be executed to confirm ownership in Service Provider and, upon

Principal's request, disclose all subcontractors or affiliates of Service Provider used to provide any of the Services. For clarity, (i) Service Provider will not use any of the Productions or Deliverables (or permit use of any of the Productions or Deliverables) other than for the sole purpose of providing Services to Principal under this Agreement or any SOW, (ii) Service Provider will provide Principal with an opportunity to review all Productions and Deliverables prior to Service Provider's use of same to identify presumptively qualified claimants, (iii) Principal may, at any time, review, revise, modify and suspend Service Provider's use of any of the Productions and Deliverables, and (iv) Service Provider grants to Principal, subject to Principal's compliance with its obligations hereunder, a perpetual, fully paid up, worldwide, exclusive, royalty free license to use the Productions and Deliverables.

5.4. Service Provider shall retain full ownership of Service Provider's ideas, know-how, processes, methodologies and materials that Service Provider possessed prior to the commencement or after of the Services, any generic content or information that is not proprietary that is used in any Production or Deliverable or which it develops independent of any activities governed by this Agreement.

6. Representations, Warranties and Covenants.

   6.1. Service Provider represents, warrants, and covenants for itself and if applicable, each of its Affiliates and subcontractors, to Principal that:

      6.1.1. The Services shall be performed in a diligent, timely, technically competent, and professional manner in accordance with applicable industry standards and the terms of this Agreement and the SOW. Service Provider shall promptly provide any information or materials relating to the Services as may be reasonably requested by Principal from time to time.

      6.1.2. All Productions and Deliverables shall consist of original materials owned by or licensed to Service Provider of its Affiliates and does not infringe on the intellectual property rights or violate the rights of publicity of any person who has not licensed its rights or consented to the use of name, likeness, voice or other personal attributes.

      6.1.3. Service Provider's performance of its obligations hereunder shall not violate any federal, state, local laws, rules, regulations, directives, or guidelines in connection with the Services, Productions or Deliverables, including (a) bar rules of any state of the United States of America that regulate promotion and advertisement by law firms, (b) federal, state, or local privacy and data security laws, regulations, and guidance and (c) the Telephone Consumer Protection Act of 1991, the Telemarketing and Consumer Fraud and Abuse Prevention Act, the Telemarketing Sales Rule, and any federal, state, local laws, rules and regulations regarding telemarketing, automatic dialing systems, call recordings, text messages, and the use of landline and mobile numbers (collectively, "Applicable Laws").

      6.1.4. To the extent that Service Provider has hired employees or engaged subcontractors to provide the Services, the hiring of such employees and engagement of such subcontractors shall be at Service Provider's sole cost

and expense and, moreover, Service Provider will require that such employees and subcontractor (a) comply with all Applicable Laws and Principal's instructions in the development, production and delivery of the Services, the Productions and the Deliverables and (b) obtain the execution of all necessary releases and agreements so as not to interfere with Service Provider's ownership in the Productions and the Deliverables and the ability of Principal to exhibit or use the Productions and the Deliverables in accordance with their intended uses as set forth in the SOW.

6.2. In addition to being true as of the Effective Date, each of the foregoing representations will be true at all times during the Term. Each of the above representations will be deemed to be material and deemed to have been relied upon by the other party.

7. Termination.

   7.1. Either Party may terminate this Agreement or any SOW at its convenience upon 30 days' prior written notice to Service Provider without any further obligation to Service Provider other than to pay undisputed amounts due for Services actually performed prior to such notice.

   7.2. Either party may terminate this Agreement upon written notice to the other party if the other party: (a) becomes insolvent or admits its inability to pay its debts generally as they become due; (b) becomes subject, voluntarily or involuntarily, to any proceeding under any domestic or foreign bankruptcy or insolvency law, which is not dismissed or vacated within 90 days after filing; (c) is dissolved or liquidated or takes any corporate action for such purpose; (d) makes a general assignment for the benefit of creditors; or (e) has a receiver, trustee, custodian or similar agent appointed by order of any court of competent jurisdiction to take charge of or sell any material portion of its property or business.

   7.3. Following any termination or expiration of this Agreement, Service Provider shall promptly return any amounts advanced by Principal in respect of Service Provider Fees that had not, as of such termination or expiration, been applied to presumptively qualified claimants (as reasonably determined by Principal).

8. Indemnification.

   8.1. Service Provider will indemnify, hold harmless and defend Principal and its Affiliates, and each of their members, partners, officers, directors, shareholders, employees, agents and representatives, from and against all Claims arising out of or resulting from: (a) willful misconduct or negligence of Service Provider, its employees and any subcontractors; (b) bodily injury or death of any person or damage to property caused by Service Provider, its employees and any subcontractors in connection with the performance of the Services; (c) any allegation that the any of the Productions or the Deliverables infringe a copyright, patent, trade secret, trademark or any other proprietary right of a third party; and (d) Service Provider's breach of its representations, warranties, covenants or obligations as set forth in this Agreement and, as applicable, any supplemental warranties contained in the SOW. "Claim" means any claim, demand,

   suit, cause of action, loss, damage, liability, fine, penalty, fee, expense and cost (including reasonable attorneys' fees and costs of litigation).

8.2. Principal will indemnify, hold harmless and defend Service Provider and its members, partners, officers, directors, shareholders, employees, agents and representatives, against all Claims arising out of or resulting from: (a) willful misconduct or negligence of Principal; and (b) Principal's breach of its representations and warranties and its confidentiality obligations as set forth in this Agreement.

8.3. A party seeking indemnification for a Claim (the "Indemnified Party") shall promptly provide written notice detailing the circumstances of that Claim to the party responsible hereunder for indemnifying against the Claim (the "Indemnifying Party"); provided, that failure to timely provide such notice shall not diminish the Indemnifying Party's indemnification obligation except to the extent the Indemnifying Party's ability to defend the Claim is materially prejudiced by such failure.  The Indemnified Party, at the Indemnifying Party's expense, shall provide the Indemnifying Party with such information and cooperation as the Indemnifying Party may reasonably request. The Indemnifying Party shall control the defense and settlement of any Claim hereunder; provided that the Indemnified Party may participate in the defense and settlement of the Claim with its own counsel at its own expense. The Indemnifying Party shall not be responsible for any costs incurred or compromise made by the Indemnified Party without the Indemnifying Party's prior written consent. The Indemnifying Party may not enter into any settlement that imposes a financial obligation on or otherwise commits or adversely impacts the Indemnified Party without the Indemnified Party's prior written consent.

8.4. If any of the Productions or the Deliverables infringes (or Principal reasonably determines that any Production or Deliverable is likely to infringe) the intellectual property rights or publicity rights of a third person, Service Provider shall, at its sole option and discretion: (a) modify the Production or the Deliverable to make it non-infringing; (b) obtain the right for Principal to use the Production or Deliverable; (c) replace the Productions or Deliverable with a non-infringing equivalent; or (d) recover the Production or Deliverable from Principal and refund the fees paid by Principal for the Production or Deliverable, reduced by an amount commensurate with Principal's prior use of the Productions or Deliverable.

8.5. Service Provider's indemnification obligations will not apply to any infringement resulting from: (a) Principal's continued use of the infringing Production or Deliverable after receipt of written notice from Service Provider of a Claim; (b) modifications to the Production or Deliverable without Service Provider's written approval, where the infringement arises directly from the modification; or (c) Principal's use of the Production or Deliverable in a manner that violates the terms of this Agreement or the SOW.

9. Insurance. Service Provider will maintain adequate insurance coverage in relation to its business and operations for the duration of the Term (including, without limitation, as to general commercial liability, cybersecurity and errors and omissions).

10. Confidential Information.

10.1. "Confidential Information" means the Principal Data and any other non-public information, know-how and trade secrets that (a) are designated as "confidential", (b) a reasonable person knows or reasonably should understand to be confidential. Confidential Information includes the terms of this Agreement and any negotiations or discussions between the parties, and any information, regardless of the form or medium, concerning a party's business activities, ideas, products, research, processes, methodologies, trade secrets, customers and technical knowledge that is obtained from or through, or delivered by or on behalf of the disclosing party. Each party agrees (i) it will not disclose the other party's Confidential Information to third parties other than its affiliates and its and their respective directors, officers, employees, advisors, financing sources or agents who need to know such Confidential Information and who agree to treat such Confidential Information on a confidential basis, and (ii) it will use the other party's Confidential Information only for purposes contemplated under this Agreement and not for its own benefit. The recipient party shall take reasonable steps to protect the disclosing party's Confidential Information and shall restrict access to Confidential Information on a need to know basis to its personnel who have a legitimate business purpose in connection with the subject matter of this Agreement and who have agreed to hold same on a confidential basis. In any event, the recipient party will be responsible for any breach of this Agreement by or on behalf of any of its personnel.

10.2. Notwithstanding the foregoing, Confidential Information does not include information: (a) that is or becomes publicly available through no fault of the recipient; (b) that is independently developed or received by the recipient as evidenced by relevant business records; (c) was lawfully previously known to the recipient; or (d) that is received from another source who can disclose it lawfully without an obligation to keep it confidential. Either party may disclose the other's Confidential Information (i) to the extent required to comply with a court order or other government demand that has the force of law, (ii) in confidence to a government attorney to report a violation of the law, or (iii) to such party's attorney or in a sealed filing in a retaliation action. Before doing so, the party must (x) seek the highest level of protection available; (y) disclose only that portion of the Confidential Information required to be disclosed; and (z) where possible, give the disclosing party enough prior notice to provide a reasonable chance to seek a protective order. Confidential Information shall, except to the extent otherwise required by applicable law or professional rules, be returned or destroyed (provided that such destruction is certified in writing by an authorized representative of the disclosing party) upon the earlier of termination or expiration of this Agreement, or the disclosing party's written request, which destruction shall include without limitation the complete erasure of any electronic file, folder, database or other electronic repository from all computer processing units on which the Confidential Information had been placed or stored.

10.3. The obligation of the parties under this section shall continue for a period of 5 years following the expiration or termination of this Agreement. Expiration or termination of this Agreement shall not affect any accrued rights or remedies to which either party is entitled under this section.

10.4. Upon termination of this Agreement, each party shall promptly return, as is commercially feasible and at the written request of the other party, all Confidential Information of the requesting party and all other data and materials in its possession.

11. Assignment, Subcontractors, Service Provider Personnel.

    11.1. This Agreement may not be assigned by Service Provider without the prior written consent of Principal.

    11.2. Service Provider may, at its sole cost and expense, subcontract, assign or delegate any of the Services or its obligations under this Agreement or the SOW (whether to provide materials or services in connection with the Services, in whole or in part), to any third party without first obtaining the prior written consent of Principal (it being understood that Service Provider will remain ultimately responsible for the performance of the Services and the obligations set forth herein and in the SOW).

12. Principal Approvals. Subject to Section **Error! Reference source not found.**,

    12.1. If any Services performed under this Agreement by Service Provider are incorrect, incomplete, defective, in error or otherwise not in conformity with the terms of this Agreement or the SOW, and Principal becomes aware of same, Principal shall promptly inform Service Provider of the deficiency and Service Provider shall use commercially reasonable efforts to, at its option, correct, complete, re-perform such Services at no charge to Principal. If compliant Services cannot be provided within a reasonable time after notification, Principal may terminate this Agreement and/or the SOW and receive a refund of any fees already paid to Service Provider for the non-conforming Services.

    12.2. Principal may request modifications to the Productions or Deliverables. If such modifications do not require Service Provider's expenditure of significant additional time and effort, then the requested modifications will be incorporated into the Productions or Deliverables and Service Provider will perform the requested modifications with no changes to the SOW. If such modifications require Service Provider's expenditure of significant additional time and effort, then the parties will negotiate in good faith appropriate revisions to the SOW, including the applicable fees. Upon the parties' agreement to such revisions, the SOW will be amended accordingly, and Service Provider will perform the requested modifications.

13. Publicity. Service Provider shall not issue any press release or make any other public statement concerning the relationship between the parties or the Services, the Productions and the Deliverables or use Principal's name or Principal IP in any customer list, marketing materials, or website without Principal's prior written consent.

14. Severability. If any term or provision of this Agreement shall be held to be invalid, void or unenforceable, then the remainder of this Agreement shall not be affected, impaired or invalidated, and each such term and provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

15. Entire Agreement. This Agreement, including its exhibits, constitutes the entire agreement of the parties hereto and supersedes all prior and contemporaneous representations, proposals, discussions, and communications, whether oral or in writing.

16. Equitable Relief. The parties acknowledge that any breach of its confidentiality obligations may result in irrevocable harm to the other party, and that the remedies at law for such breach may not adequately compensate the non-breaching party for damages suffered. Accordingly, the parties agree that if any such breach occurs, the non-breaching party will be entitled to seek injunctive relief or such other equitable remedy as a court of competent jurisdiction may

provide. Nothing contained herein will be construed to limit the non-breaching party's right to any remedies at law, including the recovery of damages for breach of this Agreement.

17. <u>Governing Law, Attorneys' Fees</u>.

    17.1. This Agreement shall be governed by and construed in accordance with the internal laws of the State of Illinois, without regard to the conflict of laws provisions thereof.

    17.2. Any controversy or claim arising out of or relating to this Agreement, or the breach thereof, shall be settled by confidential arbitration administered by the American Arbitration Association under its Commercial Arbitration Rules (which Rules are deemed to be incorporated by reference herein). The number of arbitrators shall be one. The seat, or legal place, of arbitration and the site of all proceedings shall be Chicago, Illinois. Judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereover. The arbitrator shall have exclusive jurisdiction to determine the scope of this arbitration clause and whether any controversy or claim between the Parties arises out of, relates to, or concerns the breach of this Agreement. The arbitrator shall, in the award, allocate all or part of the costs of the arbitration to the losing party, including the arbitrator's fees and the prevailing party's reasonable attorneys' fees.

    17.3. If any legal action, arbitration or other proceeding is brought to enforce any provision in this Agreement, or because of an alleged dispute, breach or default in connection with any of the provisions of this Agreement, the prevailing party shall be entitled to recover reasonable attorneys' fees and other costs incurred in that action or proceeding, including any appeal of such action or proceeding, in addition to any other relief to which that party may be entitled.

18. <u>Survival</u>. Those provisions that by their nature are intended to survive the expiration or earlier termination of this Agreement shall so survive.

19. <u>Force Majeure</u>. If the performance of this Agreement by either party, or of any obligation under this Agreement, other than the payment of is prevented, restricted or interfered with as a result of public health, public safety, strikes, labor difficulty, lockouts, shortages or failure of supply of labor, fuel or materials, acts of God, causes associated with weather, flooding, acts or requirements of any government, enemy act, act of war or civil disorder, fire or other casualty, technical or mechanical difficulties or any other cause or circumstance beyond the reasonable control of such party ("<u>Force Majeure Event</u>"), such party shall, upon giving prior written notice to the other party, be excused from such performance to the extent of such Force Majeure Event, provided that the party so affected shall use all commercially reasonable efforts to avoid or remove such causes of non-performance, and shall continue performance whenever such causes are removed. If a Force Majeure Event prevents performance for a period in excess of ten (10) days, or such other period as mutually agreed, then the performing party may elect to terminate this Agreement on written notice to the non-performing party. If Principal terminates this Agreement in accordance with this section, Service Provider shall refund any pre-paid fees to Principal for Services not performed and completed Deliverables and use of the Principal Technology not provided, as applicable, as of the termination date.

20. <u>Modifications, Waiver</u>. This Agreement shall not be amended or modified, nor shall any waiver of any right hereunder be effective, unless set forth in a document executed by duly

authorized representatives of each party. The waiver of any breach of any term, covenant or condition herein contained, or the failure of either party to seek redress for the violation of, or to insist upon the strict performance of, any covenant or condition of this Agreement shall not be deemed to be a waiver of such term, covenant or condition or any subsequent breach of the same.

21. <u>Notices</u>. All legal notices given hereunder shall be in writing and shall be deemed to have been duly given if delivered personally with receipt acknowledged or sent by registered or certified mail or equivalent, if available, return receipt requested, or by email (which shall be confirmed by a writing sent by overnight courier, registered or certified mail or equivalent), or by nationally recognized overnight courier for next day delivery, in each case with any delivery fees pre-paid and addressed to the party at the address set forth below, or such other address provided to the other party in writing.

| | |
|---|---|
| If to Service Provider: | If to Principal: |
| Attention: Jarred Johnson | Attention Warren Postman |
| Email:   jarred@ppcsquared.com | Email: wdp@kellerpostman.com |
| | jon.lubin@kellerpostman.com |

22. <u>Execution in Counterparts</u>. This Agreement may be executed and delivered in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Counterparts may be delivered via facsimile, electronic mail (including pdf or any electronic signature complying with the U.S. federal ESIGN Act of 2000, Uniform Electronic Transactions Act or other Applicable Law) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

[SIGNATURES ON FOLLOWING PAGE]

AGREED AND ACCEPTED as of the Effective Date above written.

| PPC SQUARED DIGITAL MARKETING INC. | KELLER POSTMAN LLC |
|---|---|
| By: *[signature]* | By: *Warren Postman* (DocuSigned by, 62A48596A2EF400...) |
| Name: Jarred Johnson | Name: Warren Postman |
| Title: 7/27/2023 | Title: Managing Partner  7/27/2023 |

10

EXHIBIT A

EXHIBIT A